UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

**RESORT FUNDING LLC**,

*Plaintiff*,

*v.*

**RONALD T. HOLT, JOHN L. HOLT, III,**

*Defendants.*

**COMPLAINT**

Civil Action No.   5:14-CV-605
(GLS/TWD)

Plaintiff, Resort Funding LLC ("Resort Funding"), by its attorneys, Hiscock & Barclay, LLP, as and for its Complaint to enforce personal guaranties executed by Defendants related to an Agreement of Sale of Timeshare Receivables with Recourse upon which they have defaulted, alleges as follows:

## THE PARTIES

1.      Plaintiff Resort Funding is a Delaware limited liability company with three members: Merrill Lynch L.P. Holdings, Inc., Henson Capital, Inc., and Hamel Capital, Inc.

2.      Merrill Lynch L.P. Holdings, Inc. is a Delaware corporation with its principal place of business in New York, New York.

3.      Henson Capital, Inc. is a Delaware corporation with its principal place of business in Syracuse, New York within this judicial district.

4.      Hamel Capital, Inc. is a Delaware corporation with its principal place of business in Syracuse, New York within this judicial district.

5. The principal place of business of Resort Funding is Syracuse, New York within this judicial district.

6. Upon information and belief, Defendant Ronald T. Holt is a resident and citizen of Virginia Beach, Virginia.

7. Upon information and belief, Defendant John L. Holt, III is a resident and citizen of Midlothian, Virginia.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) in that Resort Funding and the Defendants are residents and citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

5. Venue in this district and in this Court is proper under 28 U.S.C. § 1391(b)(2).

6. Venue is also proper because the parties have contracted for exclusive venue in this judicial district.

## FACTUAL BACKGROUND

7. On July 13, 1995, Bennett Funding International, Ltd. d/b/a Resort Funding ("BFIL") and Club Land'Or (Nassau), Ltd. ("Nassau") executed an Agreement of Sale of Timeshare Receivables with Recourse ("the Agreement") relating to the sale of contracts for the interests in time share resorts located on Paradise Island, Commonwealth of Bahamas. A copy of the Agreement is attached hereto as Exhibit "A."

8. As reflected in Paragraph 16.2 thereof, as an inducement and as a condition to BFIL entering into the Agreement, Land'Or International, Inc. executed a Guaranty and

Subordination Agreement dated July 13, 1995 ("the Corporate Guaranty").  A copy of the Corporate Guaranty is attached hereto as Exhibit "B."

9.     As reflected in Paragraph 16.1 thereof, as an inducement and as a condition to BFIL entering into the Agreement, Defendants Ronald T. Holt and John L. Holt, III executed separate Guaranty and Subordination Agreements dated July 13, 1995 (collectively, "the Individual Guaranties").

10.    A copy of the Individual Guaranty executed by Defendant Ronald T. Holt is attached hereto as Exhibit "C."

11.    A copy of the Individual Guaranty executed by Defendant John L. Holt, III is attached hereto as Exhibit "D."

12.     Under the terms of an Asset Purchase Agreement dated March 26, 2004, Resort Funding is the assignee of all rights and benefits of BFIL in connection with the Agreement and the Corporate and Individual Guaranties.

13.    Paragraph 9.1 of the Agreement defines an "Event of Default" to include the "failure to pay when due any amount payable under this Agreement and said failure continues for a period of thirty (30) days from written notice thereof."

14.    Pursuant to paragraph 10.1 of the Agreement, Resort Funding has the right, on the occurrence of an Event of Default, to exercise any right, privilege and remedy under the Agreement, to institute an action for payment of all obligations and to institute an action for breach of contract.

15.    Pursuant to paragraph 1(b) of the Individual Guaranties, Ronald T. Holt and John L. Holt, III personally and unconditionally guaranteed the full complete and punctual performance of all obligations of Nassau in connection with the Agreement and agreed to pay,

*inter alia*,  all sums at any time owed by Nassau including all losses, costs, expenses and reasonable attorneys fees incurred by reason of the occurrence of an Event of Default.

17.     On February 24, 2014, Resort Funding declared Nassau and Defendants in default under the Agreement and the Individual Guaranties by, *inter alia*, failing to make payments due and owing under the Agreement.  A copy of the declaration of default is attached hereto as Exhibit "E."

18.     To date, Defendants have refused and/or failed to pay the amounts due and owing under the Agreement and the Individual Guaranties.

## AS AND FOR A FIRST CAUSE OF ACTION
## FOR BREACH OF CONTRACT

19.     Resort Funding repeats and realleges the preceding paragraphs of this Complaint as if more full set forth herein.

20.     The Agreement is a valid and enforceable contract.

21.     The Individual Guaranties are valid and enforceable contracts.

22.     Nassau has breached the Agreement, *inter alia*, failing and refusing to pay the amounts due and owing under the Agreement.

23.     Nassau's nonpayment and failure to fulfill its obligations under the Agreement constitutes an Event of Default under the Agreement.

24.     Defendants are in default and have breached the Individual Guaranties by failing to guaranty Nassau's full and complete performance of the Agreement, including the payment of all sums due and owing under the Agreement.

4

25.     As result of Defendants' default, Defendants are jointly and severally liable to Resort Funding for the amounts due and owing under the Individual Guaranties, which, at present, equal at least $365,358.14.

**WHEREFORE**, Resort Funding respectfully prays for a Judgment of the Court:

(a)     In favor of Resort Funding and against Defendants, jointly and severally, for all amounts due and owing under the Agreement and the Individual Guaranties, with pre-judgment interest from the earliest calculable date;

(b)     In favor of Resort Funding and against Defendants, jointly and severally, for reasonable costs, expenses and attorneys' fees and expenses;

(c)     For such other and further relief as the Court deems fair and proper.

**DATED:** May 22, 2014                     **HISCOCK & BARCLAY, LLP**

                                        By: s/Robert A. Barrer
                                                Robert A. Barrer
                                                Bar Roll No. 101099

                                        *Attorneys for Plaintiff*
                                        Office and Post Office Address
                                        One Park Place
                                        300 South State Street
                                        Syracuse, New York 13202
                                        Telephone (315) 425-2704
                                        Facsimile (315) 425-8544
                                        E-Mail rbarrer@hblaw.com

# EXHIBIT "A"

## AGREEMENT OF SALE OF TIMESHARE
## RECEIVABLES WITH RECOURSE

THIS AGREEMENT OF SALE OF TIMESHARE RECEIVABLES WITH RECOURSE is made this _13_ th day of July, 1995 between Bennett Funding International, Ltd. d/b/a Resort Funding ("BFIL") with its principal offices located at The Atrium, Two Clinton Square, Syracuse, New York 13202 and Club Land 'Or (Nassau), Ltd. with its principal offices located at 7814 Carousel Lane, Suite 200, Richmond, VA 23294.

### RECITALS

WHEREAS, Seller is in the business of marketing a timeshare resort known as Club Land 'Or (the "Project") located on Paradise Island, Commonwealth of the Bahamas, and conveying by an unrecorded lease agreement with respect to the individual timeshare interests at the Project and all other rights of usage and other appurtenances of and pertaining to each such timeshare interest (collectively "Time-Share Periods");

WHEREAS, Seller, in the course of conducting such business, accepts contracts for the purchase of Time-Share Periods ("Contracts") from purchasers of Time-Share Periods ("Purchasers") in order to finance the purchase of Time-Share Periods by Purchasers;

WHEREAS, Seller currently owns a portfolio of Contracts in the Project;

WHEREAS, BFIL is engaged, in addition to other activities, in the business of purchasing Contracts; and,

WHEREAS, Seller may from time to time offer to sell to and BFIL may desire to buy Contracts from Seller under the terms of this Agreement.

WITNESSETH:

NOW, THEREFORE, for good and valuable consideration provided herein and hereafter, the receipt of which is hereby acknowledged, and pursuant to the mutual covenants and conditions contained herein, the parties agree as follows:

SECTION I
DEFINITIONS

1.1     In addition to the words and terms elsewhere defined herein, the following words and terms as used herein shall have the following meanings:

"Agreement" means this Agreement Of Sale Of Timeshare Receivables With Recourse and any modifications, changes, or additions hereto.

"Chargebacks" means Defaulted Contracts which have been debited against Seller pursuant to paragraph 3.1.

"Defaulted Contracts" means any Eligible Receivable purchased by BFIL for which a payment has not been made by the Purchaser within thirty (30) days of its initial due date to BFIL or any other Eligible Receivable for which a payment has not been made to BFIL within  ninety (90) days of its due date.

"Eligible Receivables" means a Contract which:

(a)     Provides for the full payment of principal and interest in U.S. funds in consecutive monthly installments for a term not to exceed eighty-four (84) months from the date of its execution and delivery;

(b)     Has a first payment due date not more than forty-five (45) days from the date it is offered to BFIL;

(c)     Has an Obligor which is the Purchaser of at least one (1) but not more than four (4) Time-Share Periods in the Project and is acceptable in all respects to BFIL, in its sole judgment, including but not limited to the creditworthiness of that Obligor;

(d)     Is in form and substance satisfactory to BFIL, is validly enforceable in accordance with its terms and shall become due and payable upon the occurrence of an uncured default thereunder by Purchaser;

(e)     Is the underlying documentation of a Time-Share Period for which Seller has completed all required or necessary off-site improvements relating to the uses to which Seller has represented the Time-Share Period may be put, in compliance with all applicable restrictions and laws and the approvals for which have been duly obtained; and,

(f)     Complies, as does the sales transaction related thereto, with all applicable laws including but not limited to any executory obligations under which Seller has performed all obligations to Purchaser thereunder, and Purchaser does not have any then or current right of rescission, set-off, abatement or counterclaim.

"Financing Statements" means any and all UCC financing statements (including continuation statements) filed of record from time to time as required under this Agreement.

"Obligation" means any and all indebtedness, obligations, liabilities, contracts, representations, warranties, and agreements of every kind and nature between Seller and BFIL now existing or hereinafter arising, and now or hereinafter contemplated pursuant to this Agreement or otherwise.

"Purchase Price" means the present value of the term of the Eligible Receivable times the monthly payment at the Purchase Rate stated herein.

"Purchase Rate" means, for the purposes of calculating the Purchase Price, an interest rate of fourteen percent (14%) shall be applied or for those Receivables paid by Electronic Funds Transfer ("EFT") an interest rate of thirteen percent (13%) shall be applied. These rates will be reviewed on a quarterly basis and adjusted to the Prime rate, as issued from time to time by Chemical Bank, N.A., plus four and one-half percent (4.5%) or four percent (4%) for those Notes paid through EFT.

"Purchaser" means an Obligor under a Contract and any person who is obligated to make any payments pursuant to such Contract.

"Receivable Payments" means those payments on Contracts which have been sold, assigned, transferred, and set over to BFIL pursuant to this Agreement.

"Receivables" means Contracts which are, now or hereafter, assigned, endorsed and delivered to BFIL pursuant hereto; together with any of the following that are applicable:

(a)     All Contracts, notes, guaranties and other documents or instruments evidencing or securing the obligations of the Purchasers or any other person primarily or secondarily liable on such Contracts;

Page 4 of 23

(b)     All policies of insurance if any related to such Contracts are delivered in connection therewith;

(c)     All rights under any escrow agreements and all impound or reserve accounts pertaining to the foregoing;

(d)     All files, books and records of Seller pertaining to any of the foregoing; and,

(e)     Any proceeds from any of the foregoing.

"Recourse" means that Seller is obligated to pay BFIL a sum certain under a Defaulted Contract as subject to Section 3.1.

"Related Documents" means other documents and agreements between Seller and BFIL executed on even date herewith which form the basis of the transaction, together with any and all renewals, extensions, amendments, restatements or replacements thereof, whether now or hereafter existing.

"U.C.C." means the Uniform Commercial Code as enacted in the Commonwealth of Virginia and as now or hereinafter amended.

SECTION II
SUBJECT MATTER OF SALE AND PAYMENT

2.1     Seller shall, from time to time, offer to sell, transfer and assign to BFIL Contracts arising out of the sale of Time-Share Periods at the Project. The Contracts offered to BFIL shall be in the form of those attached as Exhibit A, and no Contract in any other form shall be offered

to BFIL unless previously approved by BFIL in writing.  Concurrently with the transfer of each Contract, Seller shall transfer and assign or cause to be transferred and assigned to BFIL the Contract, Note, loan applications, financial statements, truth-in-lending disclosure statement, any closing or settlement statement and the receipt for timeshare sale documents.

2.2     All Contracts hereafter offered to BFIL shall be offered under and pursuant to the terms, conditions, representations, covenants, provisions and warranties set forth herein and in said Contracts, unless otherwise expressly agreed to in writing at the time such Contracts shall be offered to BFIL.  This Agreement shall govern the sale, transfer, and assignment of all Contracts by Seller to BFIL arising out of the Project.  BFIL shall be given a reasonable opportunity, in each case, to investigate the credit of any and to qualify the Purchaser obligated upon the Contract and shall not be deemed to have purchased any Contract until credit therefor has been noted on BFIL's books and records to an account of Seller or until receipt of payment by Seller, whichever occurs first.  BFIL will use its best efforts to pay to Seller, within ten (10) business days after receipt of the Contracts and Related Documents the funds to which Seller would be entitled from any Contract accepted by BFIL.

2.3     For the Term of this Agreement (as hereinafter defined) BFIL may purchase up to Two Million Dollars ($2,000,000.00) per year. Seller agrees that BFIL has the right of first refusal to purchase all Notes generated in futuro by the sale of Time-Share Periods in the Project even if annual sales of Time-Share Periods exceeds the Two Million Dollar ($2,000,000.00) commitment limitation hereunder. The right of first refusal aforesaid does not apply to any Notes or Contracts executed prior to even date herewith and shall be available to BFIL for so long as any Note acquired hereby remains unpaid. BFIL shall, upon sixty (60) days prior written notice to Seller, renew this Agreement on the anniversary date of the execution hereof provided the following conditions are satisfied:

(a)     No Event of Default under section 9.1 hereunder has occurred as is continuing;

(b)     Actual sales of Time-Share Periods in the Project must achieve seventy-five percent (75%) or greater of the projected sales as provided by and to be attached hereto by Seller; and,

(c)     The financial condition of the Seller and the Project must meet the standards of BFIL as outlined in Section 4.9 hereunder.

2.4     The term of this Agreement shall commence upon even date herewith and shall terminate on the first anniversary date therefrom ("Term").

2.5     Should a Contract be prepaid or recoursed back to the Seller, then any portion of the difference between the present value ("PV") of the Eligible Receivable at the Seller's interest rate to the consumer and the PV of the Eligible Receivables at BFIL's interest rate funded to Seller shall be repaid by the Seller on a pro-rata basis.

2.6     BFIL shall pay to Seller eighty-five percent (85%) of the Purchase Price upon closing of each Contract subject to paragraphs 2.1, 2.3 and 2.6 hereof.

2.7     BFIL shall pay Seller the remaining fifteen percent (15%) of the Purchase Price upon BFIL's receipt from the Purchaser of all payments due under the purchased Contract. Seller acknowledges that it does not have the right to receive the remaining fifteen percent (15%) payment until BFIL receives all sums due under the purchased Contract. Any interest earned on said fifteen percent (15%) shall belong solely to BFIL.

2.8     Contracts offered to BFIL will be valid purchase Contracts arising out of sales of Time-Share Periods at the Project. The Contracts shall call for not more than eighty-four (84) successive amortized monthly installments of principal and interest.

2.9     The entire outstanding amount due under all Contracts sold to BFIL pursuant to this Agreement may be repurchased in whole, but not in part, at any time, by Seller or a third party, upon not less than thirty (30) days prior irrevocable written notice to BFIL. Any prepayment of aggregate principal amounts due under the Contracts shall be accompanied by all interest accrued to the date of prepayment, any fees or expenses payable and a premium with respect to outstanding principal as follows:

| Pre-Payment Period | Pre-Payment Penalty |
| --- | --- |
| During 1st year | 7% |
| During 2nd year | 6% |
| During 3rd year | 5% |
| During 4th year | 4% |
| During 5th year | 3% |
| During 6th year | 2% |
| During 7th year | 1% |

Parties agree that no pre-payment penalty shall be charged to the Time-Share Period Purchasers, as defined herein. In no event shall the prepayment by the Purchaser trigger a pre-payment penalty under this section 2.9.

2.10    Seller agrees that should any Time-Share Period purchased by BFIL be paid in full by the Time-Share Purchaser thereof, within ninety (90) days of the first due date thereunder a one time processing fee of Fifty Dollars ($50.00) shall be charged to the Seller.

SECTION III
RECOURSE

3.1     If payment of any installment payable under a Contract has been in default for a period of ninety (90) days or more, Seller hereby unconditionally agrees to repurchase said Contract from BFIL within ten (10) days after written demand or, Seller may, at its option, forward a new Contract within fifteen (15) days after demand by BFIL, which has a principal balance term and yield not less than the Contract being repurchased, which shall also be with recourse and the proceeds of which shall be used to repurchase the aforesaid Defaulted Contract at the Contract Repurchase Price (as hereinafter defined) with any remaining balance funded to the Seller.  The repurchase price of any Contract which Seller is required to repurchase pursuant to this paragraph shall be a sum equal to the remaining principal balance of the Purchase Price of the defaulted Contract, plus accrued interest and late fees less any balance remaining of the Purchase Price not yet paid to Seller pursuant to Section II hereof ("Contract Repurchase Price").

3.2     Upon payment to BFIL of the Contract Repurchase Price, the Defaulted Contract shall be re-transferred to Seller by assignment free and clear of any rights of any person claiming through or under BFIL and without recourse.  Such re-transfer shall include an endorsement without recourse and delivery of the Note to the Seller, and return of all Related Documents regarding the Defaulted Contract.

3.3     Notwithstanding anything stated to the contrary in this Agreement, Seller shall have no recourse obligation to BFIL to repurchase or substitute a Contract until such time as a Contract  becomes as Defaulted Contract.

SECTION IV
## WARRANTIES AND REPRESENTATIONS

4.1     In connection with the execution of this Agreement and the Related Documents, Seller represents and warrants and, so long as any balance is outstanding on any purchased Contract, shall be deemed to represent and warrant continuously to BFIL as follows in paragraph 4.2 through and including 4.16 of this Section IV.

4.2     That Seller is a validly existing corporation organized under the laws of the Commonwealth of the Bahamas and qualified to do business under the laws of the Commonwealth of Virginia. Seller is qualified to do business and is in good standing under the laws of such other jurisdictions as required to conduct its business as presently conducted and has all licenses and permits necessary to conduct its business as and where presently conducted.

4.3     That Seller has the power and authority to:

        (a)     Own its property and transact the business in which it is engaged or presently proposes to engage; and

        (b)     Execute, deliver and perform this Agreement and Related Documents. The execution, delivery and performance of this Agreement and the Related Documents have been duly authorized by all requisite action required by law and by its by-laws.

4.4     That the execution, delivery and performance of this Agreement and the Related Documents by Seller does not and will not constitute a breach or violation of:

        (a)     The Seller's by-laws or articles of incorporation; or,

(b)     Any other instrument or contract between the parties or any other law, administrative regulation or court decree by which the Seller is bound.

·4.5     That Seller is not in default under any indenture, mortgage, deed of trust, agreement or other instrument to which it is a party.

4.6     That this Agreement and each of the Related Documents are valid, binding and enforceable in accordance with their terms and do not require the consent or approval of any governmental body, agency or authority not otherwise obtained.

4.7     That there are no actions, suits or proceedings served or to the knowledge of Seller pending or threatened, against or affecting Seller before any court, arbitrator or governmental or administrative body or agency which might result in any material adverse change in the business, operations, properties or assets or in the financial condition of Seller. Seller is not in default in any material respect under any applicable statute, rule, order, decree or regulation of any court, arbitrator or governmental agency having jurisdiction over it.

4.8     That Seller has filed tax returns, income or otherwise, which are required to be filed by it and has paid or established adequate reserves for all taxes which have become due pursuant to such returns or pursuant to any assessment received by them.  Seller has no knowledge of any unassessed tax or tax deficiency proposed or threatened against it.

4.9     That the financial statements of Seller delivered to BFIL are correct and fairly present the financial condition of Seller as of the date of such statements.  There has been no material adverse change in the financial condition of Seller since the date of such statements.

4.10    That no part of this Agreement or the Related Documents or any certificate or statement furnished by Seller to BFIL contains or will contain, on any closing date, any

misleading or untrue statement of a material fact. To the best of Seller's knowledge, there is no fact (other than facts relating to general economic conditions) which materially adversely affects the business, operations, affairs, conditions, properties or assets of Seller which has not been set forth in the documents, certificate or statement furnished to BFIL.

4.11     That the address of the chief executive office and the principal place of business of the Seller is 7814 Carousel Lane, Suite 200, Richmond, VA 23294. All records, including computer records pertaining to the purchased Eligible Receivables, collections thereon and Contracts and Related Documents giving rise thereto are kept at the above address.

4.12     That each Contract shall comply with all applicable Federal, State and Bahamian statutes and regulations, including, without limitation, truth-in-lending laws, Federal and State disclosure requirements and regulations, and other laws, regulations and requirements pertaining to the enforcement or enforceability of the Contracts.

4.13     That the Contracts and assignments of the Contracts shall be fully enforceable in accordance with their terms.

4.14     That Seller has complied in all respects with all Federal, State, Bahamian and local laws, ordinances, regulations and orders applicable to its business. Seller has all Federal, State, Bahamian and local governmental licenses and permits material to and necessary in the conduct of its business including, but not limited to the origination, purchasing and sale of consumer contracts and such licenses are in full force and effect and no violations are or have been recorded in respect to any such licenses or permits and no proceeding is pending or threatened to revoke any thereof.

4.15     That the Contracts are genuine and in all respects what they purport to be and enforceable according to their terms, all statements contained in the Contracts are true and that

all unpaid balances shown therein are correct; and, the Contracts, and the Related Documents and the obligations which they evidence are, and will continue to be, free and clear of all defenses, setoffs, counterclaims, liens and encumbrances of every kind and nature.

·4.16    That, prior to the transfer of any funds to Seller under this Agreement, Seller shall have good title to the Contracts and full right to enter into the Contracts; services and facilities shall be available to the Purchaser in satisfactory condition and have been accepted by the Purchaser under the terms of the Contracts; all parties to the Contracts have full capacity to contract; all filing and recording required by law have been completed and complied with; and, that any requirement of new or further filing, recording or renewals thereof shall be complied with by Seller and that BFIL may undertake same but shall be without any responsibility or obligations whatsoever for any omission or invalid accomplishment thereof.

4.17    That Seller shall have no authority to accept any collections of any sums under the Contracts unless BFIL consents thereto, except for dues, special assessments or user fees.  Upon the occurrence of an Event of Default pursuant Section III hereof and without releasing the liability of Seller, BFIL may, in its own discretion, grant extensions of time of payment to and compromise or release claims against the Purchaser who is in default on a Contract upon thirty (30) days notice to Seller.  During this thirty (30) day period, the Seller shall have the right to cure the Event of Default by a Purchaser.


## SECTION V
## INDEMNIFICATION


5.1    Seller agrees to indemnify and hold harmless BFIL against any and all losses, claims, damages, expenses or liabilities, joint or several, to which BFIL may become subject, under Bahamian, Federal or State statutory law or regulations, at common law or otherwise, insofar as such losses, claims, damages, expenses, liabilities or actions arise out of or are based

upon any untrue statement or alleged untrue statement of any material fact contained hereunder or in any Contract or Related Document; and, upon notice, will reimburse BFIL for any legal or other expenses reasonably incurred by it in connection with investigating or defending any such loss, claim, damage, liability or action.

5.2    This indemnity shall be in addition to any liability which the Seller may have to BFIL in equity, at common law or otherwise.

SECTION VI
ASSIGNMENT

6.1    As to the Contracts that have been sold to BFIL, Seller shall not assign, sublet, lend, transfer, pledge, or hypothecate any such Contracts or this Agreement. BFIL however may assign, transfer, pledge, or sell its interest in any or all Contracts or this Agreement or the Related Documents. Upon notification of such assignment, Seller shall remit any payments due hereunder from the Seller directly to the address set forth on the notification. In no event shall any collateral assignee of BFIL be obligated to perform any duty, covenant, condition, or promise under this Agreement, any Contract or Related Document. It is understood and agreed that on any collateral assignment, BFIL shall be obligated to perform its obligations hereunder.

SECTION VII
PROHIBITION AGAINST INDEBTEDNESS

7.1    That during the pendency of this Agreement and the Related Documents, and, in any event, until BFIL is in receipt of all monies and other sums due BFIL from Seller hereunder, Seller shall not do or cause to be done any of the following without the prior written approval of BFIL, which approval shall not be unreasonably withheld:

Page 14 of 23

(a)     Sell or lease all or substantially all of its assets both real and personal property, out of the ordinary course of its business or enter into any merger, consolidation or other agreement for the sale of the business;

(b)     Except as specifically provided hereunder, mortgage, pledge, or voluntarily subject to any lien or encumber any Contract sold to BFIL; or,

(c)     Change the type or character or the standard operation of Seller out of the ordinary course of business.

## SECTION VIII
## TAX

8.1     In the event that any sales tax is levied against BFIL in the Commonwealth of the Bahamas or the Commonwealth of Virginia pursuant to the sale and purchase of the Contracts or upon the stream of payments generated thereon, Seller agrees to pay said sales tax upon sixty (60) days notice.

## SECTION IX
## EVENT OF DEFAULT

9.1     The occurrence of any of the following events shall constitute an Event of Default as such term is used herein:

(a)     Seller's failure to pay when due any amount payable under this Agreement and said failure continues for a period of thirty (30) days from written notice thereof;

(b)     Any statement, representation or warranty made herein or in any supporting financial statement by or on behalf of Seller shall prove to have been false when made or breached in any material respect which deprives BFIL of any material economic value of its bargain;

(c)     Failure to observe or perform any covenant or obligation contained in this Agreement or any Related Document, the breach of which deprives BFIL of any material economic value of its bargain;

(d)     The institution of any proceeding by or against Seller under any bankruptcy or insolvency laws or the general assignment of Seller's assets for the benefit of its creditors;

(e)     Termination of any contract or licensing agreement with a reciprocal use network organization unless a comparable contract or licensing agreement is entered into, subject to Developer's control;

(f)     Termination or suspension of the operation or the Seller out of the ordinary course of business;

(g)     The aggregate of the stream of payments of Chargebacks exceeds fifteen (15%) percent of the aggregate stream of payments on all Contracts sold by Borrower to BFIL to date hereunder;

(h)     The number of Defaulted Contracts exceeds fifteen (15%) percent of all Contracts sold to BFIL to date hereunder; or,

(i)     Any act of Seller which materially and adversely limits the rights of Time-Share Period Purchasers to use the common areas and recreational facilities of the Project.

## SECTION X
## RIGHTS ON DEFAULT

10.1    Seller agrees that when any Event of Default has occurred and is continuing, BFIL may do any or all of the following:

(a)     Proceed to exercise any rights, privileges and remedies that Seller would be entitled to exercise as payee under the Contracts either in the name of BFIL or with full power in the name of Seller as its true and lawful attorney-in-fact for the use and benefit of BFIL with respect to such Contracts;

(b)     Institute an action against Seller for the payment of all recourse obligations hereunder; and,

(c)     Institute an action against Seller for damages for breach of contract.

10.2    No delay or omission of BFIL to exercise any right or power arising from the occurrence of any Event of Default shall exhaust or impair any such right or power or prevent its exercise during the continuance of such Event of Default. No waiver by BFIL of any such Event of Default, whether such waiver be full or partial, shall extend to or be taken to affect any subsequent Event of Default, or to impair the rights resulting therefrom except as may be otherwise provided therein. No remedy hereunder is intended to be exclusive of any other remedy but each and every remedy given hereunder or otherwise existing shall be cumulative; nor shall the giving, taking or enforcement of any other or additional security, collateral or

guaranty, waive any rights, powers or remedies hereunder, nor shall BFIL be required to look first to, enforce or exhaust such other or additional security, collateral or guaranties.

10.3    It is expressly understood that BFIL's rights hereunder do not include the right to demand the repurchase by Seller of any Contract that is not a Defaulted Contract.

SECTION XI
NOTICE

11.1    The parties agree that any notice required hereunder shall be sent by certified mail, return receipt requested at the last known business address of the respective parties and by forwarding a copy of the notice by regular first-class U.S. mail, unless a specific notice requirement is set forth below:

> To Seller:      Club Land 'Or (Nassau), Ltd.
>                 7814 Carousel Lane, Suite 200
>                 Richmond, VA 23294
>                 Attn: Ronald T. Holt
>
> with copies to:
>
> (a)      Francis T. Eck, Esq.
>          Eck, Collins & Marsteller
>          16 South Second St.
>          Richmond, VA 23219
>
> (b)      Ronald T. Holt
>          c/o Land 'Or International, Inc.
>          7814 Carousel Lane, Suite 200
>          Richmond, VA 23294
>
> (c)      John L. Holt III
>          11325 Buck Head Terrace
>          Midlothian, VA 23113

Page 18 of 23

To BFIL:    Bennett Funding International, Ltd.
                 The Atrium
                 Two Clinton Square
                 Syracuse, New York 13202
                 Attn:  Thomas J. Hamel

                 with copies to:

(a)     Edward J. Gaudino, Esq.
          Bennett Funding International, Ltd.
          Two Clinton Square
          Syracuse, New York 13202

## SECTION XII
## FINANCIAL STATEMENTS AND SALES REPORTS OF SELLER

12.1    So long as this Agreement is in effect, Seller shall deliver to BFIL, within two hundred (200) days of the end of its respective fiscal year, a copy of its annual financial statements which shall be prepared and certified as complete and correct by the principal financial officer of Seller.  Within thirty (30) days after the end of each fiscal quarter, Seller shall deliver to BFIL a copy of its unaudited quarterly statements covering such quarter.  Seller shall deliver to BFIL a full report of all completed sales and all pending Contracts each month.

## SECTION XIII
## SERVICING AND COLLECTION

13.1    Seller shall furnish BFIL with an executed letter on Seller's letterhead advising Purchasers of the sale and assignment of the Contracts hereunder to BFIL.

13.2    BFIL shall invoice Purchasers on a monthly basis.  BFIL shall employ collection efforts consisting solely of past-due letters and telephone calls.  Upon repurchase of Chargebacks by Seller from BFIL, Seller shall bear all responsibility for collection and legal action.

13.3    BFIL shall provide Seller with bi-monthly aging reports of the Contracts.

## SECTION XIV
## TERMINATION

14.1    This Agreement may be terminated one (1) year from the execution of this Agreement.  Upon the occurrence of any Event of Default, BFIL may, without notice or proceeding with sale or foreclosure or demanding payment of the Obligations, terminate BFIL's further performance under this Agreement to purchase Eligible Receivables, without further liability or obligation by BFIL.  BFIL may also, upon the occurrence of an Event of Default and at any time thereafter, appropriate and apply to any Obligation any and all reserves, or other monies due or owing to the Seller held by BFIL hereunder or under any other financing agreement or otherwise, whether accrued or not.  Neither such termination, nor the termination of this Agreement by lapse of time, the giving of notice or otherwise shall absolve, release or otherwise affect the liability of the Seller with respect of transactions prior to such termination, or affect any of the liens, security interests, rights, powers and remedies of BFIL hereunder, but they shall, in all events, continue until all of the Obligations are satisfied.

## SECTION XV
## LEGAL

15.1    This Agreement and the Related Documents constitute the entire agreement and understanding between the parties.

15.2    This Agreement and Related Documents may not be amended, changed, modified, or supplemented except in writing executed by all parties hereto.

15.3    In the event any provision of this Agreement or any Related Document, including the remedies upon the occurrence of an Event of Default, be declared invalid, such provision or remedy shall be inapplicable and deemed omitted, but the remaining provisions and remedies shall be given full force and effect.

15.4    This Agreement and the Related Documents shall be deemed to have been negotiated and made in Onondaga County, State of New York, regardless of the order in which the signatures of the parties shall be affixed hereto.

15.5    This Agreement and the Related Documents shall be interpreted, construed, and enforced in accordance with the laws of the State of New York, with regard to New York's Conflict of Laws rules and public policies.

15.6    In any action to enforce the provisions of this Agreement or the Related Documents, personal jurisdiction and venue shall be in the United States District Court for the Northern District of New York. In any action hereunder, the prevailing party shall be entitled to reasonable attorneys fees and costs.

15.7    This Agreement and the Related Documents shall be binding upon and inure to the benefit of the parties to it and their respective successors and assigns.

15.8    The parties acknowledge that this Agreement supersedes all prior negotiations, commitments, understandings and agreements between the parties and that this Agreement is the full and final expression of the parties.  Any statements made by representatives of each party

shall not be admissible to vary, change, modify or amend the terms and conditions of this Agreement except in conformity with paragraph 15.2.

## SECTION XVI
## SPECIAL PROVISIONS

16.1     In order to insure payment and performance hereunder by Seller, the personal guaranties and subordination of Ronald T. Holt and John L. Holt III shall be required. Said guaranties shall be joint and several and shall be absolute and unconditional in guarantying the full payment and performance of Seller and the recourse obligations hereunder.

16.2     In order to insure payment and performance hereunder by Seller, the corporate guaranty and subordination of Land 'Or International, Inc. shall be required. Said Guaranty shall be absolute and unconditional in guarantying the full payment and performance of Seller and the recourse obligations hereunder.

16.3     Upon or prior to closing Seller shall pay BFIL the sum of Five Thousand ($5,000.00) Dollars as an analysis fee for costs associated with the financing contemplated hereunder.

16.4     Closing is subject to receipt and review to Seller's and BFIL's mutual satisfaction of each document required to be provided to Seller and more particularly described in the Closing Letter between Seller and BFIL.

16.5     It is understood and agreed to by all parties undersigned that the performance of this Agreement of Sale of Timeshare Receivables With Recourse is contingent upon Seller maintaining an approval of the Public Offering Statement, with exhibits, for Club Land 'Or, a

Time-Share Project, from the Virginia Department of Professional and Occupational Regulation and is in compliance with all provisions required by the Virginia Statutes.

16.6    This Agreement may be signed in any number of counterparts with the same effect as if the signatures thereto and hereto were upon the same instrument.

IN WITNESS WHEREOF, the parties set their hands the date above first written.

Bennett Funding International, Ltd.                    Club Land 'Or (Nassau), Ltd.

By:                                                   By:

Michael A. Bennett, Chief Executive Officer               Ronald T. Holt, President

GUARANTORS:

Ronald T. Holt                                        John L. Holt III

Land 'Or International, Ltd.

Ronald T. Holt, President

# EXHIBIT "B"

### *GUARANTY AND SUBORDINATION AGREEMENT*

THIS GUARANTY AND SUBORDINATION AGREEMENT ("Guaranty") by and between Land 'Or International, Ine. ("Guarantor") and Bennett Funding International, Ltd.d/b/a Resort Funding ("BFIL") is made this ∕3 th day of July, 1995.

### RECITALS

WHEREAS, BFIL is entering into an Agreement of Sale of Timeshare Reeeivables With Reeourse ("Agreement") with Club Land 'Or (Nassau), Ltd. ("Developer") bearing even date herewith; and,

WHEREAS, BFIL is willing to enter into the Agreement with Developer only if Guarantor agrees to guaranty the full, timely, faithful performance of and payment under and compliance with the Agreement and the instruments, promissory notes, agreements and documents called for thereunder (collectively the "Documents").

NOW THEREFORE, in order to induce BFIL to enter into the Agreement with Developer and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, Guarantor hereby unconditionally covenants and agrees with BFIL as follows:

1.    The Guarantor hereby unconditionally guaranties to BFIL:

(a)    The full, complete and punctual performance by Developer of all the terms, covenants and conditions contained in the Documents ("Obligations") and

(b)    The payment of all sums at any time owed by the Developer under the Documents as and when the same shall become due and payable, whether at maturity, by acceleration or otherwise, according to the terms of the Documents, and all losses, costs, expenses and reasonable attorneys' fees incurred by reason

of the  occurrence of an Event of Default under the Documents (herein collectively the "Indebtedness").  In case of failure by the Developer to pay the Indebtedness when due, the Guarantor hereby unconditionally agrees to immediately make such payment as and when the same shall become due and payable, whether at maturity, by acceleration or otherwise.

2.      Guarantor hereby agrees that its obligations hereunder shall be unconditional, irrespective of:

(a)      The validity, regularity or enforceability of the Indebtedness;

(b)      The absence of any attempt to collect from the Developer or any other Guarantor;

(c)      Whether any other action has been instituted or taken to enforce the same;

(d)      The waiver or consent by BFIL with respect to any provisions of the Documents;

(e)      The validity or enforceability of the Guaranty against one or more of any other Guarantor;

(f)      The validity or enforceability of the Agreement or the Documents; or,

(g)      Any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a Guarantor.

3.      Guarantor hereby waives diligence, presentment, demand for payment, filing of claims with a court in the event of receivership or bankruptcy of the Developer, protest or notice with respect to the Indebtedness and all demands whatsoever and covenants that its Guaranty will not be discharged except by complete performance of the Obligations of the Developer contained in the Documents. Upon the occurrence of an Event of Default by Developer, BFIL may, at its option, proceed directly and at once, without notice, against the Guarantor to collect and recover the full amount of its liability hereunder, or any portion thereof, without proceeding against the Developer, or any other person, or foreclosing upon, selling, or otherwise disposing of or collecting or applying any property, real or personal, BFIL may then hold as security for such Indebtedness.

4.      Guarantor authorizes BFIL, without notice or demand and without affecting the liability of the Guarantor hereunder, from time to time to:

> (a)     Renew, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of the Indebtedness or any part thereof;

> (b)     Accept partial payments on the Indebtedness;

> (c)     Take and hold security for the payment under this Guaranty or of the Indebtedness and exchange, enforce, waive and release any such security;

> (d)     Apply such security and direct the order or manner of sale thereof as BFIL in its discretion may determine; and,

> (e)     Settle, release, compromise, collect or otherwise liquidate any Indebtedness and any security therefor in any manner, without affecting or

impairing the Obligations of Guarantor hereunder. BFIL may, without notice assign this Guaranty in whole or in part.

5.      Until all Indebtedness of the Developer to BFIL shall have been paid in full, Guarantor shall have no right of subrogation, and Guarantor waives any right to enforce any remedy which BFIL now has or may hereafter have against the Developer and any benefit of, and any right to participate in, any security at any time held by BFIL. Guarantor waives all set-offs and counterclaims and all presentments, demands for performance, notices of non-performance, protests, notices of protest, notices of dishonor, and notices of acceptance of the Guaranty and of the existence, creation, or incurring of new or additional Indebtedness.

6.      Guarantor subordinates all Guarantor's liens, security interests, claims and rights of any kind that Guarantor may now have or hereafter acquire against Developer or Developer's assets and property ("Developer's Property") resulting from Developer's present and future indebtedness to Guarantor ("Subordinated Indebtedness"), and agrees that all liens, security interests, claims and rights of any kind that Guarantor may now have or hereafter acquire against Developer or Developer's Property resulting from the Subordinated Indebtedness shall be subordinate, inferior and subject to the claims and rights of BFIL against Developer or Developer's Property under the terms of any of the Documents whether direct or contingent or whether now or hereafter created. Guarantor grants to BFIL a security interest in the Subordinated Indebtedness, which shall be collected, enforced and received by the holder thereof for BFIL and be paid over to BFIL on account of the Obligations, but without reducing or affecting in any manner the liability of Guarantor under any of the other provisions of this Guaranty; provided, however, that unless an Event of Default has occurred and is continuing, Guarantor may retain for his own account reasonable salaries or fees for services in the annual amount presently paid. Notwithstanding anything herein to the contrary, if any portion of the Subordinated Indebtedness becomes due and payable prior to its stated maturity, BFIL shall be

entitled to receive full performance of the Obligations before any holder thereof is entitled to receive any payment on the Subordinated Indebtedness.

      7.     Guarantor will not take any action which will either:

          (a)     Force the sale of Developer's Property in order to satisfy the Subordinated Indebtedness, or

          (b)     Affect in any manner any and all of BFIL's liens, security interests, claims or rights of any kind that BFIL may now have or hereafter acquire against Developer or Developer's Property.

      Gnarantor will refrain from taking any action which is in any way inconsistent with or in derogation of this subordination or of the rights of BFIL hereunder and covenants to perform such further acts as necessary or appropriate to giving effect to this subordination. Without limiting the generality of the foregoing, Guarantor will not assign any portion of the Subordinated Indebtedness, except expressly subject to the terms of this Guaranty; and Guarantor shall cause all evidence of the Subordinated Indebtedness to set forth the provisions hereof or to bear a legend that it is subject hereto.

      8.     This Guaranty constitutes the entire understanding of the parties with respect to the subject matter hereof and neither this Guaranty nor any provision hereof may be amended, terminated, changed, waived or discharged orally, but only by an instrument in writing signed by the party against which enforcement of the amendment, termination, change, waiver or discharge is sought.

      ·9.     *No failure or delay by BFIL or the holder or assignee of any Agreement in* exercising any right, power or privilege hereunder or thereunder shall operate as a waiver

thereof; nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege.

10.     This Guaranty and the rights of the parties hereunder shall be interpreted, construed and enforced in accordance with the laws and public policies of the State of New York, exclusive of New York's Conflict of Laws rules and public policies. IN ANY ACTION TO ENFORCE THE PROVISIONS OF THIS GUARANTY, PERSONAL JURISDICTION AND VENUE SHALL BE IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK.

IN WITNESS WHEREOF, this Guaranty has been executed by the undersigned on this /3 th day of July, 1995.

Land 'Or International, Inc.

Ronald T. Holt, President

# EXHIBIT "C"

### *GUARANTY AND SUBORDINATION AGREEMENT*

THIS GUARANTY AND SUBORDINATION AGREEMENT ("Guaranty") by and between Ronald T. Holt ("Guarantor") and Bennett Funding International, Ltd.d/b/a Resort Funding ("BFIL") is made this *13* th day of July, 1995.

### RECITALS

WHEREAS, BFIL is entering into an Agreement of Sale of Timeshare Receivables With Recourse ("Agreement") with Club Land 'Or (Nassau), Ltd. ("Developer") bearing even date herewith; and,

WHEREAS, BFIL is willing to enter into the Agreement with Developer only if Guarantor agrees to guaranty the full, timely, faithful performance of and payment under and compliance with the Agreement and the instruments, promissory notes, agreements and documents called for thereunder (collectively the "Documents").

NOW THEREFORE, in order to induce BFIL to enter into the Agreement with Developer and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, Guarantor hereby unconditionally covenants and agrees with BFIL as follows:

1. The Guarantor hereby unconditionally guaranties to BFIL:

    (a) The full, complete and punctual performance by Developer of all the terms, covenants and conditions contained in the Documents ("Obligations") and

    (b) The payment of all sums at any time owed by the Developer under the Documents as and when the same shall become due and payable, whether at maturity, by acceleration or otherwise, according to the terms of the Documents, and all losses, costs, expenses and reasonable attorneys' fees incurred by reason

Page 1 of 6

of the occurrence of an Event of Default under the Documents (herein collectively the "Indebtedness"). In case of failure by the Developer to pay the Indebtedness when due, the Guarantor hereby unconditionally agrees to immediately make such payment as and when the same shall become due and payable, whether at maturity, by acceleration or otherwise.

2.  Guarantor hereby agrees that its obligations hereunder shall be unconditional, irrespective of:

(a)  The validity, regularity or enforceability of the Indebtedness;

(b)  The absence of any attempt to collect from the Developer or any other Guarantor;

(c)  Whether any other action has been instituted or taken to enforce the same;

(d)  The waiver or consent by BFIL with respect to any provisions of the Documents;

(e)  The validity or enforceability of the Guaranty against one or more of any other Guarantor;

(f)  The validity or enforceability of the Agreement or the Documents; or,

(g)  Any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a Guarantor.

3.    Guarantor hereby waives diligence, presentment, demand for payment, filing of claims with a court in the event of receivership or bankruptcy of the Developer, protest or notice with respect to the Indebtedness and all demands whatsoever and covenants that its Guaranty will not be discharged except by complete performance of the Obligations of the Developer contained in the Documents. Upon the occurrence of an Event of Default by Developer, BFIL may, at its option, proceed directly and at once, without notice, against the Guarantor to collect and recover the full amount of its liability hereunder, or any portion thereof, without proceeding against the Developer, or any other person, or foreclosing upon, selling, or otherwise disposing of or collecting or applying any property, real or personal, BFIL may then hold as security for such Indebtedness.

4.    Guarantor authorizes BFIL, without notice or demand and without affecting the liability of the Guarantor hereunder, from time to time to:

(a)    Renew, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of the Indebtedness or any part thereof;

(b)    Accept partial payments on the Indebtedness;

(c)    Take and hold security for the payment under this Guaranty or of the Indebtedness and exchange, enforce, waive and release any such security;

(d)    Apply such security and direct the order or manner of sale thereof as BFIL in its discretion may determine; and,

(e)    Settle, release, compromise, collect or otherwise liquidate any Indebtedness and any security therefor in any manner, without affecting or

impairing the Obligations of Guarantor hereunder. BFIL may, without notice assign this Guaranty in whole or in part.

5.     Until all Indebtedness of the Developer to BFIL shall have been paid in full, Guarantor shall have no right of subrogation, and Guarantor waives any right to enforce any remedy which BFIL now has or may hereafter have against the Developer and any benefit of, and any right to participate in, any security at any time held by BFIL. Guarantor waives all set-offs and counterclaims and all presentments, demands for performance, notices of non-performance, protests, notices of protest, notices of dishonor, and notices of acceptance of the Guaranty and of the existence, creation, or incurring of new or additional Indebtedness.

6.     Guarantor subordinates all Guarantor's liens, security interests, claims and rights of any kind that Guarantor may now have or hereafter acquire against Developer or Developer's assets and property ("Developer's Property") resulting from Developer's present and future indebtedness to Guarantor ("Subordinated Indebtedness"), and agrees that all liens, security interests, claims and rights of any kind that Guarantor may now have or hereafter acquire against Developer or Developer's Property resulting from the Subordinated Indebtedness shall be subordinate, inferior and subject to the claims and rights of BFIL against Developer or Developer's Property under the terms of any of the Documents whether direct or contingent or whether now or hereafter created. Guarantor grants to BFIL a security interest in the Subordinated Indebtedness, which shall be collected, enforced and received by the holder thereof for BFIL and be paid over to BFIL on account of the Obligations, but without reducing or affecting in any manner the liability of Guarantor under any of the other provisions of this Guaranty; provided, however, that unless an Event of Default has occurred and is continuing, Guarantor may retain for his own account reasonable salaries or fees for services in the annual amount presently paid. Notwithstanding anything herein to the contrary, if any portion of the Subordinated Indebtedness becomes due and payable prior to its stated maturity, BFIL shall be

entitled to receive full performance of the Obligations before any holder thereof is entitled to receive any payment on the Subordinated Indebtedness.

7.      Guarantor will not take any action which will either:

(a)     Force the sale of Developer's Property in order to satisfy the Subordinated Indebtedness or

(b)     Affect in any manner any and all of BFIL's liens, security interests, claims or rights of any kind that BFIL may now have or hereafter acquire against Developer or Developer's Property.

Guarantor will refrain from taking any action which is in any way inconsistent with or in derogation of this subordination or of the rights of BFIL hereunder and covenants to perform such further acts as necessary or appropriate to giving effect to this subordination. Without limiting the generality of the foregoing, Guarantor will not assign any portion of the Subordinated Indebtedness, except expressly subject to the terms of this Guaranty; and Guarantor shall cause all evidence of the Subordinated Indebtedness to set forth the provisions hereof or to bear a legend that it is subject hereto.

8.      This Guaranty constitutes the entire understanding of the parties with respect to the subject matter hereof and neither this Guaranty nor any provision hereof may be amended, terminated, changed, waived or discharged orally, but only by an instrument in writing signed by the party against which enforcement of the amendment, termination, change, waiver or discharge is sought.

9.      No failure or delay by BFIL or the holder or assignee of any Agreement in exercising any right, power or privilege hereunder or thereunder shall operate as a waiver

thereof; nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege.

10.     This Guaranty and the rights of the parties hereunder shall be interpreted, construed and enforced in accordance with the laws and public policies of the State of New York, exclusive of New York's Conflict of Laws rules and public policies. IN ANY ACTION TO ENFORCE THE PROVISIONS OF THIS GUARANTY, PERSONAL JURISDICTION AND VENUE SHALL BE IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK.

IN WITNESS WHEREOF, this Guaranty has been executed by the undersigned on this _13_ th day of July, 1995.

Ronald T. Holt

# EXHIBIT "D"

### *GUARANTY AND SUBORDINATION AGREEMENT*

THIS GUARANTY AND SUBORDINATION AGREEMENT ("Guaranty") by and between John L. Holt III ("Guarantor") and Bennett Funding International, Ltd.d/b/a Resort Funding ("BFIL") is made this __/3__ th day of July, 1995.

### RECITALS

WHEREAS, BFIL is entering into an Agreement of Sale of Timeshare Receivables With Recourse ("Agreement") with Club Land 'Or (Nassau), Ltd. ("Developer") bearing even date herewith; and,

WHEREAS, BFIL is willing to enter into the Agreement with Developer only if Guarantor agrees to guaranty the full, timely, faithful performance of and payment under and compliance with the Agreement and the instruments, promissory notes, agreements and documents called for thereunder (collectively the "Documents").

NOW THEREFORE, in order to induce BFIL to enter into the Agreement with Developer and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, Guarantor hereby unconditionally covenants and agrees with BFIL as follows:

1.      The Guarantor hereby unconditionally guaranties to BFIL:

      (a)      The full, complete and punctual performance by Developer of all the terms, covenants and conditions contained in the Documents ("Obligations") and

      (b)      The payment of all sums at any time owed by the Developer under the Documents as and when the same shall become due and payable, whether at maturity, by acceleration or otherwise, according to the terms of the Documents, and all losses, costs, expenses and reasonable attorneys' fees incurred by reason

of the occurrence of an Event of Default under the Documents (herein collectively the "Indebtedness"). In case of failure by the Developer to pay the Indebtedness when due, the Guarantor hereby unconditionally agrees to immediately make such payment as and when the same shall become due and payable, whether at maturity, by acceleration or otherwise.

2.     Guarantor hereby agrees that its obligations hereunder shall be unconditional, irrespective of:

(a)     The validity, regularity or enforceability of the Indebtedness;

(b)     The absence of any attempt to collect from the Developer or any other Guarantor;

(c)     Whether any other action has been instituted or taken to enforce the same;

(d)     The waiver or consent by BFIL with respect to any provisions of the Documents;

(e)     The validity or enforceability of the Guaranty against one or more of any other Guarantor;

(f)     The validity or enforceability of the Agreement or the Documents; or,

(g)     Any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a Guarantor.

·3.　　Guarantor hereby waives diligence, presentment, demand for payment, filing of claims with a court in the event of receivership or bankruptcy of the Developer, protest or notice with respect to the Indebtedness and all demands whatsoever and covenants that its Guaranty will not be discharged except by complete performance of the Obligations of the Developer contained in the Documents.  Upon the occurrence of an Event of Default by Developer, BFIL may, at its option, proceed directly and at once, without notice, against the Guarantor to collect and recover the full amount of its liability hereunder, or any portion thereof, without proceeding against the Developer, or any other person, or foreclosing upon, selling, or otherwise disposing of or collecting or applying any property, real or personal, BFIL may then hold as security for such Indebtedness.

4.　　Guarantor authorizes BFIL, without notice or demand and without affecting the liability of the Guarantor hereunder, from time to time to:

(a)　　Renew, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of the Indebtedness or any part thereof;

(b)　　Accept partial payments on the Indebtedness;

(c)　　Take and hold security for the payment under this Guaranty or of the Indebtedness and exchange, enforce, waive and release any such security;

(d)　　Apply such security and direct the order or manner of sale thereof as BFIL in its discretion may determine; and,

(e)　　Settle, release, compromise, collect or otherwise liquidate any Indebtedness and any security therefor in any manner, without affecting or

Page 3 of 6

impairing the Obligations of Guarantor hereunder. BFIL may, without notice assign this Guaranty in whole or in part.

5. *Until all Indebtedness of the Developer to BFIL shall have been paid in full,* Guarantor shall have no right of subrogation, and Guarantor waives any right to enforce any remedy which BFIL now has or may hereafter have against the Developer and any benefit of, and any right to participate in, any security at any time held by BFIL. Guarantor waives all set-offs and counterclaims and all presentments, demands for performance, notices of non-performance, protests, notices of protest, notices of dishonor, and notices of acceptance of the Guaranty and of the existence, creation, or incurring of new or additional Indebtedness.

6. Guarantor subordinates all Guarantor's liens, security interests, claims and rights of any kind that Guarantor may now have or hereafter acquire against Developer or Developer's assets and property ("Developer's Property") resulting from Developer's present and future indebtedness to Guarantor ("Subordinated Indebtedness"), and agrees that all liens, security interests, claims and rights of any kind that Guarantor may now have or hereafter acquire against Developer or Developer's Property resulting from the Subordinated Indebtedness shall be subordinate, inferior and subject to the claims and rights of BFIL against Developer or Developer's Property under the terms of any of the Documents whether direct or contingent or whether now or hereafter created. Guarantor grants to BFIL a security interest in the Subordinated Indebtedness, which shall be collected, enforced and received by the holder thereof for BFIL and be paid over to BFIL on account of the Obligations, but without reducing or affecting in any manner the liability of Guarantor under any of the other provisions of this Guaranty; provided, however, that unless an Event of Default has occurred and is continuing, Guarantor may retain for his own account reasonable salaries or fees for services in the annual amount presently paid. Notwithstanding anything herein to the contrary, if any portion of the Subordinated Indebtedness becomes due and payable prior to its stated maturity, BFIL shall be

entitled to receive full performance of the Obligations before any holder thereof is entitled to receive any payment on the Subordinated Indebtedness.

7.    Guarantor will not take any action which will either:

(a)    Force the sale of Developer's Property in order to satisfy the Subordinated Indebtedness, or

(b)    Affect in any manner any and all of BFIL's liens, security interests, claims or rights of any kind that BFIL may now have or hereafter acquire against Developer or Developer's Property.

Guarantor will refrain from taking any action which is in any way inconsistent with or in derogation of this subordination or of the rights of BFIL hereunder and covenants to perform such further acts as necessary or appropriate to giving effect to this subordination. Without limiting the generality of the foregoing, Guarantor will not assign any portion of the Subordinated Indebtedness, except expressly subject to the terms of this Guaranty; and Guarantor shall cause all evidence of the Subordinated Indebtedness to set forth the provisions hereof or to bear a legend that it is subject hereto.

8.    This Guaranty constitutes the entire understanding of the parties with respect to the subject matter hereof and neither this Guaranty nor any provision hereof may be amended, terminated, changed, waived or discharged orally, but only by an instrument in writing signed by the party against which enforcement of the amendment, termination, change, waiver or discharge is sought.

.9.    No failure or delay by BFIL or the holder or assignee of any Agreement in exercising any right, power or privilege hereunder or thereunder shall operate as a waiver

thereof; nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege.

10.    This Guaranty and the rights of the parties hereunder shall be interpreted, construed and enforced in accordance with the laws and public policies of the State of New York, exclusive of New York's Conflict of Laws rules and public policies. IN ANY ACTION TO ENFORCE THE PROVISIONS OF THIS GUARANTY, PERSONAL JURISDICTION AND VENUE SHALL BE IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK.

IN WITNESS WHEREOF, this Guaranty has been executed by the undersigned on this __10__ th day of July, 1995.

_____
John L. Holt III

# EXHIBIT "E"

## HISCOCK & BARCLAY LLP

**Robert A. Barrer**
*Partner*

February 24, 2014

## CERTIFIED MAIL - RETURN RECEIPT REQUESTED and REGULAR MAIL

Club Land'Or (Nassau), Ltd
7814 Carousel Lane, Suite 200
Richmond, VA 23294
Attn: Ronald T. Holt

> Re:     Resort Funding LLC ("Resort Funding") v. Club Land'Or (Nassau), Ltd.
> ("Land'Or"), Ronald T. Holt, John L. Holt, III and Land'Or International, Inc.
> (the aforementioned last two individuals and corporation, "Guarantors")

Dear Sir:

We have been retained by Resort Funding regarding its relationship with Land'Or and the Guarantors.  Resort Funding is the assignee of all rights and benefits of Bennett Funding International, Ltd. ("BFIL") under the following documents: (a) Agreement of Sale of Timeshare Receivables with Recourse dated July 13, 1995 between BFIL and Land'Or ("the Purchase Agreement"); (b) Guaranty and Subordination Agreement dated July 13, 1995 between Ronald T. Holt and BFIL; (c) Guaranty and Subordination Agreement dated July 13, 1995 between John L. Holt, III and BFIL; and (d) Guaranty and Subordination Agreement dated July 13, 1995 between Land'Or International, Inc. and BFIL.  All abbreviations not otherwise defined herein shall have the meanings set forth in the Purchase Agreement

An Event of Default has occurred under the terms and conditions of the Purchase Agreement.  As a result of the aforesaid default, Land'Or and the Guarantors are each liable under the aforementioned agreements.

By this letter, Resort Funding demands immediate and unconditional payment in full of the Contract Repurchase Price for the Defaulted Contracts, currently consisting of $285,893.79 of the remaining principal balance of the Purchase Price of the Defaulted Contracts and interest in the amount of $103,585.70, as of February 24, 2014, from Land'Or and the Guarantors.

A per diem interest charge continues to accrue on the remaining principal balance of the Contract Repurchase Price of the Defaulted Contracts.  Also, attorneys' fees and costs continue to be incurred by Resort Funding.  Unless immediate payment is received by Resort Funding in

7877880.1

Club Land 'Or (Nassau), Ltd.
February 24, 2014
Page 2

the above-referenced principal sum plus interest as of the date of payoff, Resort Funding shall institute such actions as it deems appropriate to protect its interest including, but not limited to, the commencement of civil actions in such jurisdictions as may be deemed appropriate.

The failure by Resort Funding to exercise any of its rights or remedies under the Purchase Agreement or any related loan documents shall not be deemed a waiver of, or preclude the exercise of, any of its other rights and remedies under any of the loan documents evidencing or securing the indebtednesses owed by Land'Or to Resort Funding, or any rights or remedies that Resort Funding may have at law or in equity. Resort Funding expressly reserves unto itself all such rights and remedies. In addition, the exercise or failure to exercise by Resort Funding of any of its rights or remedies contained in the aforementioned documents shall not cure or waive any default.

A copy of this notice of default and demand is being transmitted to the Guarantors.

Very truly yours,

Robert A. Barrer

RAB:lam
cc:     Ronald T. Holt
        909 Enfield Chase
        Virginia Beach, VA 23452
        **Cert. Mail, Return Receipt Req. and Regular Mail**

        John L. Holt, III
        11325 Buckhead Terrace
        Midlothian, VA 23113
        **Cert. Mail, Return Receipt Req. and Regular Mail**

        Philip W. Richardson, Esq.
        Eck, Collins & Richardson
        16 South Second Street
        Richmond, VA 23219
        **Cert. Mail, Return Receipt Req. and Regular Mail**

7877880.1